IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JANNETTE CASTRO RAMOS,

Plaintiff,

v.

TOPERBEE CORPORATION, et. als.,

Defendants.

CIVIL NO. 15-1462 (CVR)

## OPINION AND ORDER

## INTRODUCTION

The present cause of action arises after co-Defendant Toperbee Corporation ("Toperbee") and Luxottica (operating under the name "Pearle Vision") entered into an asset purchasing agreement whereby Toperbee acquired the Pearle Vision store located in San Patricio Plaza Mall, together with several assets, from Luxottica.   Toperbee operates several franchises of Pearle Vision stores in Puerto Rico, and provides eye care services, including contact lenses, treatments and products for eye care, and designer eyewear and sunglasses, among others.   Co-Defendant William Juarbe ("Juarbe") is Toperbee's President (collectivelly "Defendants").

Plaintiff Jannette Castro Ramos ("Plaintiff"), a former employee, avers that Toperbee undertook certain actions against her that culminated in her constructive discharge from her position as an optometrist assistant.   She now seeks relief under the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12101 *et seq*; the Age Discrimination in Employment Act, 29 U.S.C. §621 *et seq*; ("ADEA"); Title VII of the Civil Rights Act of 1964 and of 1991, 42 U.S.C. §2000e *et seq.*, ("Title VII"); and under several Puerto Rico laws pertaining to discrimination, retaliation and unlawful termination.   Among

Plaintiff's claims are that she suffered from a visual impairment and is therefore disabled as defined by the ADA, and that in spite of knowing this, Toperbee failed to grant her reasonable accommodation. Plaintiff also alleges age-based discrimination, and retaliation.

Defendants now move for summary disposition of all claims, arguing that Plaintiff is not a qualified individual with a disability for purposes of the ADA, and thus is not entitled to a reasonable accommodation. Defendants further posit that they never challenged Plaintiff's alleged impairment, which in any event was not supported by the most recent documentation in her personnel file. Instead, Toperbee bent over backwards to make concessions to address Plaintiff's requests for accommodation, including working from her home, all of which were unreasonably turned down by her. They also assert that the alleged discriminatory actions complained of are clearly not actionable, and are instead a reflection of Plaintiff's resentment over the changes brought about by the commercial transaction between Luxottica and Toperbee, which she opposed. Defendants finally aver that no personal liability can ensue against co-Defendant Juarbe for causes of action arising under Title VII, ADA, and ADEA.

Plaintiff counters, stating categorically that she is a disabled person under the ADA, and that she was discriminated and retaliated against for such condition, and that Defendants' discriminatory actions pushed her to the limit, where an unwanted resignation was her only choice that gave rise to the constructive discharge. Furthermore, as part of Plaintiff's opposition, she also asserts that partial summary

_____

judgment should be granted in her favor instead, insofar as the facts clearly show that she was disabled, retaliated against and was constructively discharged.

For the following reasons, Defendant's Motion for Summary Judgment (Docket No. 30) is GRANTED.   Plaintiff's request for partial summary judgment (Docket No. 41) is DENIED.

## STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Fed.R.Civ.P. 56 (c).   Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law."   Vega-Rodríguez v. Puerto Rico Tel. Co., 110 F.3d 174, 178 (1st Cir. 1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact."   Cortés-Irizarry v. Corporación Insular, 111 F.3d 184, 187 (1st Cir. 1997).   A fact is deemed "material" if it potentially could affect the outcome of the suit.   Id.   Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor."   Id. At all times during the consideration of a motion for summary judgment, the Court must

_____

examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

The First Circuit Court of Appeals has "emphasized the importance of local rules similar to Local Rule 56 [of the District of Puerto Rico]." Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007); see also Colón v. Infotech Aerospace Servs., Inc., 869 F.Supp.2d 220, 225-226 (D.P.R. 2012). Rules such as Local Rule 56 "are designed to function as a means of 'focusing a district court's attention on what is -and what is not- genuinely controverted.' " Calvi v. Knox County, 470 F.3d 422, 427 (1st Cir. 2006)). Local Rule 56 imposes guidelines for both the movant and the party opposing summary judgment. A party moving for summary judgment must submit factual assertions in "a separate, short, and concise statement of material facts, set forth in numbered paragraphs." Loc. Rule 56(b). A party opposing a motion for summary judgment must "admit, deny, or qualify the facts supporting the motion for summary judgment by reference to each numbered paragraph of the moving party's statement of facts." Loc. Rule 56 (c). If they so wish, they may submit a separate statement of facts which they believe are in controversy. Facts which are properly supported "shall be deemed admitted unless properly controverted." Loc. Rule 56(e); P.R. Am. Ins. Co. v. Rivera-Vázquez, 603 F.3d 125, 130 (1st Cir. 2010) and Colón, 869 F.Supp.2d at 226. Due to the importance of this function to the summary judgment process, "litigants ignore [those rules] at their peril." Hernández, 486 F.3d at 7.

_____

## UNCONTESTED FACTS

At the outset, the Court must mention that Plaintiff's opposition to Defendants' statement of uncontested material facts was procedurally non-compliant with the Local Rules, insofar as many of the denials do not oppose the truth of the statement offered.   A review of Plaintiffs' qualifications of Defendants' fact statements shows that they are either irrelevant to the matter at hand, offered additional evidence not related to the fact in question and/or failed to contradict it, or consisted of mere "speculation, generalities, conclusory assertions, improbable inferences, and, for lack of a better phrase, a lot of 'hot air.' " Domínguez v. Eli Lilly and Co., 958 F.Supp. 721, 728 (D.P.R. 1997).   As a result of this procedural mishap, unless otherwise stated, the Court deemed admitted most facts from Defendants' statement of uncontested material facts.

1. On July 3, 1997, Plaintiff obtained a diploma from the National College of Business and Technology after completing an associate degree as an optometrist assistant.   D. Exhibit 3, p. 34, l. 7-19.

2. Plaintiff started working for Pearle Vision in 1997 as an optometrist assistant at the Vega Baja store.   D. Exhibit 3, p. 62, l. 16-18.   Most of the time throughout Plaintiff's employment with Pearle Vision, she held the same position.   D. Exhibit 3, p. 38, l. 8-17.

3. As an optometrist assistant, Plaintiff conducted the following preliminary examinations on patients: measuring the pressure of the eye, auto refraction (to determine whether a patient needs prescription), and instructed patients in

the care and use of glasses or contact lenses. D. Exhibit 3, p. 35, l. 6-24; p. 36, l. 1-21.

4. Plaintiff learned the task of medical billing and coding. D. Exhibit 3, p. 39, l. 15-24; p. 40, l. 1-4.   For seven years, from 2000 until 2007, while working for Pearle Vision (under Luxottica's operation), Plaintiff was in charge of the medical billing and coding for the Pearle Vision San Patricio ("PVSP") store. D. Exhibit 3, p. 42, l. 9-17; p. 43, l. 3-8.

5. On May 2007, while working for Pearle Vision, Plaintiff obtained a diploma from Nova College after completing a certification as a Medical Office Assistant with Medical Billing and Coding.   She completed said training with high honors. D. Exhibit 3, p. 39, l. 7-22; p. 40, l. 1-2.

6. Under Luxottica's administration of PVSP, Plaintiff worked Monday thru Wednesdays, Fridays and Saturdays, and alternate Sundays. Basically, since Plaintiff started working in San Patricio, she was off Thursdays.   D. Exhibit 3, p. 104, l. 9-24. Additionally Plaintiff, like other employees with greater seniority, had the following fringe benefits: health insurance, including dental; retirement plan; accrual of sick and vacation leave greater than the statutory rates; a free pair of glasses once a year, and additional holidays or special days with pay.   She also left work at 6:00 pm.   D. Exhibit 3, p. 53, l. 12-24; p. 54, l. 1-24; p. 55, l. 1-24; p. 56, l. 1-24; p. 57, l. 1-15.

7. From 1997 until 2000, Plaintiff was relocated throughout the following Pearle

_____

Vision stores: Vega Baja, Bayamón Shopping Center, Montehiedra and Trujillo Alto.   D. Exhibit 3, p. 62, l. 5-24; p. 63; l. 1-16.

8. On or around 2004, Plaintiff started working as a retail supervisor in PVSP. She resigned in 2011 and went back to her prior position as an optometrist assistant. D. Exhibit 3, p. 61, l. 6-17.

9. Sometime around March 2009, while working at San Patricio, Plaintiff again requested to be relocated to Pearle Vision Rexville because said store was closer to her home. Plaintiff's request was denied due the lack of vacancies.   D. Exhibit 3, p. 80, l. 6-24.

10. In March 2011, when Plaintiff resigned to her position as a retail supervisor, she requested again to be relocated to the Rexville store in order to have a daytime work schedule and to avoid driving longer distances from her home, because of her medical condition.   D. Exhibit 3, p. 79, l. 1-24; p. 80, l. 1-24; p. 81, l. 1-24.   Plaintiff's request was never granted. Exhibit 3, p. 83, l. 1-2.

11.  Some of these relocations were decided upon Pearle Vision's needs, for example, to reduce payroll overhead.   D. Exhibit 3, p. 63; l. 17-24; p. 64, l. 1-6, 19-23. Also, some relocations were approved pursuant to Plaintiff's request. Id. Plaintiff asked to be relocated from Montehiedra, where she ended up working only for two days because said store is open at night, contrary to Bayamón Shopping Center, where she had previously worked. D. Exhibit 3, p. 64, l. 7-13. Following Plaintiff's request, she was relocated from Montehiedra to Trujillo

Alto, but after a month she was relocated to San Patricio, because of the distance.   Exhibit 3, p. 64, l. 7-18.

12. Toperbee was founded in the 1980's and has since been engaged in the operation of several franchises of Pearle Vision in Puerto Rico, providing vision care services, including expert guidance on lenses, treatments and eye care products.   They also offer designer eyewear and sunglasses.   D. Exhibit 1, ¶ 1.

13. William Juarbe ("Juarbe"), currently 56 years old, is the President of the Company and has held said position since 1983.   Id., ¶ 2.

14. Toperbee acquired the PVSP assets from Luxottica on June 23, 2013, through an asset purchase agreement. Id., ¶ 3; D. Exhibit 2, p. 83, l. 16-20.

15. Prior to the asset purchase, Toperbee operated two stores in Caguas, one in Cidra, and one in Guayama.   D. Exhibit 1, ¶ 4.

16. During 2014, Toperbee's stores operated in the following schedule:

   a. Plaza del Carmen Mall, in Caguas: Monday thru Saturday, from 9:00 am to 6:00 pm;

   b. Plaza Las Catalinas Mall, in Caguas: Monday thru Saturday, from 10:00 am to 9:00 pm, and Sunday from 11:00 am to 5:00 pm;

   c. Plaza Cidra: Monday thru Saturday, from 9:00 am to 6:00 pm;

   d. Plaza Guayama: Monday thru Saturday,[1] from 9:00 am to 7:00 pm;

_____

[1] This would seem to be an oversight, as Juarbe states that this store is open Monday through Saturday from 6 to 9, and then, Friday and Saturday from 9 to 9.   In any event, it is an omission that has no effect on the Court's analysis.

_____

> Friday and Saturday from 9:00 am to 9:00 pm and Sunday from 12:00
> am to 5:00 pm.
>
> Currently, the above mentioned stores operate in the same schedule.
> D. Exhibit 1, ¶ 5.

17. As part of the asset purchase agreement, Toperbee would retain three of the employees who worked for PVSP, including Plaintiff.   D. Exhibit 2, p. 16, l. 9-15; p. 20, l. 2-25.

18. As the asset purchase process developed, Juarbe met the employees who were going to be retained.   Specifically, Juarbe met Plaintiff when he visited PVSP to see whether it would be possible to set up a laboratory there. Exhibit 2, p. 22, l. 16-23; p. 23, l. 13-15.

19. When Juarbe learned about Plaintiff's experience and work history within the company, Juarbe suggested she should become the manager of PVSP.   D. Exhibit 3, p. 99, l. 1-8.

20. At the time of the ongoing asset purchase process, Plaintiff presumably suffered from a visual condition and she was 49 years old.   D. Exhibit 3, p. 87, l. 12-18; p. 110, l. 20-22.

21. Plaintiff did not want the transaction between Luxottica and Toperbee to take place. Although she was not aware of the details, she feared that her fringe benefits could be altered as a result of it.   D. Exhibit 3, p. 95, l. 2-24; p. 96, l. 1-2. Moreover, she was also concerned that the accommodation previously

_____

granted by Luxottica, whereby she was allowed to leave work at 6:00 pm, would not be upheld.   D. Exhibit 3, p. 96, l. 19-24; p. 97, l. 1-24; p. 98, l. 1-7. Additionally, Plaintiff was afraid that, following the transaction, she would be relocated to another store, because it was rumored between the employees that Toperbee owned other stores and chances were that employees could be relocated.   D. Exhibit 3, p. 98, l. 8-18; p. 100, l. 21-22; p. 101, l. 5-11.

22. Plaintiff actually told Juarbe that she prayed for the transaction not to take place and she was disappointed when it happened.   D. Exhibit 3, p. 101, l. 12-21.

23. During Juarbe's visits to PVSP, and prior to the completion of the asset purchase transaction, Plaintiff approached him on occasions to ask if she would be paid the same salary after the transaction.   Juarbe told her not to worry and reassured her that Toperbee was a family-owned company, so everything was going to be fine after the transition.   D. Exhibit 2, p. 25, l. 8-18, 24-25. Plaintiff also mentioned to Juarbe that she had difficulties driving at night because of her poor vision, and told him that she had a special work-schedule that allowed her to leave work at 6:00 pm, which she refers to as reasonable accommodation.   D. Exhibit 2, p. 25, l. 19-25; p. 26, l. 1-10.

24. Once the asset acquisition was completed, PVSP maintained the same operating schedule it had under the operation of Luxottica.   It opened Monday thru Saturday, from 9:00 am to 9:00 pm; and Sundays from 12:00 am to 5:00

_____

pm.   Exhibit 1, ¶ 6.

25. During 2014, Toperbee's stores operated with the following number of employees:

    a.  San Patricio Plaza Mall: 1 part time and 3 full time;

    b.  Plaza Las Catalinas Mall: 1 part time and 7 full time;

    c.  Plaza del Carmen Mall: 3 full time;

    d.  Plaza Cidra: 1 part time and 2 full time;

    e.  Guayama: 5 full time.

    Exhibit 1, ¶ 7.

26. When the asset purchase transaction was finalized, Toperbee did not give a copy of the Employee Handbook to the employees in PVSP until it was updated, a process that took more time than expected.   D. Exhibit 1, ¶ 8.

27. As per Toperbee's practices, staffing needs have always been fueled by the store's performance and needs. Likewise, generally, as a business practice, Toperbee's employees are not permanently assigned to a specific store. They can be relocated pursuant to staffing demands.   D. Exhibit 1, ¶ 10.

28. Because some of Toperbee's stores remain open to the public at night, it has always been of utmost importance that employees be willing and available to work on those shifts. Under normal circumstances, Toperbee strives to distribute the closing shifts evenly among its employees to avoid imposing an undue burden on them. Exhibit 1, ¶ 11.

_____

29. Each full-time employee had the duty to close the store and, under normal circumstances, did so around 87 days a year. D. Exhibit 1, ¶ 9.

30. It has not been part of Toperbee's business practice to do annual employee performance appraisals or provide annual salary increases to its employees. Exhibit 1, ¶ 12.

31. Shortly after the asset purchase took place, upon Plaintiff's indication that she could not work at night, Juarbe asked her if she would agree to work in another Toperbee store located in Caguas. That conversation occurred during the first months following the asset purchase, on June 23, 2013.   D. Exhibit 2, p. 27, l. 24-25; p. 28, l. 1-25; p. 30, l. 15-25; p. 31, l. 1;

32.  Plaintiff mentioned that she did not want to be relocated to Caguas because she would be farther from home.   D. Exhibit 2, P. 27, l. 24-25, p. 28, l. 1-2, 15-16, l. 20-25; p. 29, l. 1-5. Plaintiff lives in the Municipality of Toa Baja, Puerto Rico.   D. Exhibit 3, p. 20, l. 2-10.

33. The alternative of relocating the Plaintiff to Caguas was initially discussed with her in July, 2013.   Plaintiff's relocation to Plaza del Carmen, where Toperbee could uphold her desired schedule without imposing an undue burden on other employees, was again considered and decided upon sometime in July 2014.   D. Exhibit 1, ¶ 13.

34. Plaza del Carmen store in open from 9:00 am to 6:00 pm; it does not operate during night shifts (after 6:00 pm). Because of that, Plaza del Carmen –which

was the closest store to Plaintiff's home besides San Patricio- was where Plaintiff's request for a specific schedule could be honored without imposing an undue burden among the rest of the employees.   D. Exhibit 1, ¶14.

35. Plaintiff considered that the transfers that were put into effect pursuant to Luxottica's needs and without her prior request were discriminatory. However, those that were approved, as requested by her, did not make her feel the same way. Exhibit 3, p. 64, l. 19-23; p. 92, l. 5-24; p. 93, l. 1-23.

36. By June 2013, Plaintiff's pay rate was $10.22 per hour. She worked from 9:00 am to 6:00 pm, as per the work schedule accommodation granted by Luxottica. D. Exhibit 3, p. 57, l. 19-24; p. 58, l. 2-8.

37. Defendants became an "ongoing business" of its predecessor Luxottica by following and continuing the same business activity, using the same location for such operations, employing the same people, including Plaintiff, using the same machinery and equipment and same method of production with the same products and services; retention of the same name (i.e. Pearle Vision), and the continuation of the business while the commercial transaction was ongoing. P. Exhibit 3, p. 13-16, l.1-25.

38.  The Asset Purchase Agreement stated that Toperbee's offer of employment to existing employees "must be for similar or substantially similar employment conditions and benefits…" than those they enjoyed before. P. Exhibit 13, p. 9. Section 4.3.

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 14
_____

39. Following Toperbee's acquisition of PVSP, Plaintiff maintained the same daytime schedule, from 9:00 am to 6:00 pm, and was paid the same hourly rate.   D. Exhibit 3, p. 101, l. 22-24; p. 102, l. 1-5; p. 147, l. 12-14.

40. During her time with Toperbee, Plaintiff held the same position as an optometrist assistant.   D. Exhibit 3, p. 37, l. 23-24; 38, l. 1.

41. Plaintiff worked five days a week (Mondays through Wednesdays, Fridays and Saturdays) and alternate Sundays.   D. Exhibit 3, p. 104, l. 9-24; p. 105, l. 1-7. Her son used to pick her up at work at least three times a week.   Throughout Plaintiff's time with Toperbee, her son picked her up at work from Monday through Wednesday and on those occasions, Plaintiff did not have to drive.   D. Exhibit 3, p. 103, l. 20-24; p. 104, l. 1-8; p. 105, l. 8-21; p. 107, l. 2-14.

42. Shortly after Toperbee's acquisition of PVSP, Plaintiff met with Juarbe on two occasions.   D. Exhibit 3, p. 107, l. 15-24; p. 108, l. 1-24; p. 109, l. 1-2.   These meetings were held at Plaintiff's request, to address her work related concerns. D. Exhibit 3, p. 109, l. 10-19.

43. One of the purposes of the first meeting was getting to know Juarbe.   They spoke about Plaintiff's work history and employment benefits with Luxottica, her concerns regarding changes in the terms and conditions of her employment, and Toperbee's employment policies, among other topics.   D. Exhibit 3, p. 110, l. 5-8; p. 111, l. 21-24; p. 112, l. 1-6. Plaintiff asked Juarbe to

provide her with copy of Toperbee's Employee Handbook because she wanted to get acquainted with its policies.    Juarbe told her that Toperbee had an Employee Handbook but it was different from Luxottica's. D. Exhibit 3, p. 112, l. 15-24; p. 113, l. 1-6.

44. Although Plaintiff did not receive the copy of Toperbee's Employee Handbook when she first requested it, she did not confront any difficulties performing her functions. D. Exhibit 3, p. 115, l. 10-16. Also, during that first meeting, Juarbe described to Plaintiff her fringe benefits with Toperbee, so Plaintiff was not unaware of that information.    P. Exhibit 3, p. 118, l. 17-24; p. 119, l. 1-7.

45.  In that first meeting, Plaintiff asked Juarbe if he was aware about the reasonable accommodation that Luxottica had granted her because of her visual condition. D. Exhibit 3, p. 119, l. 9-24. Plaintiff told Juarbe that she had a special schedule that allowed her to leave work at 6:00 pm. D. Exhibit 2, p. 25, l. 19-25; p. 26, l. 1-3.

46. Juarbe told Plaintiff that he would consider her for the manager position, which she declined, because she had always preferred to be an indian rather the chief. D. Exhibit 3, p. 119, l. 19-24.

47. As the manager of the store, Plaintiff would have been able to control her schedule because she would have been in charge of preparing it. However, she declined the offer because the managerial position was too demanding.    D. Exhibit 3, p. 120, l. 1-10.

48. Juarbe admitted that he reviewed Plaintiff's file, had knowledge of the documents within Plaintiff's employee file, including the certifications by Dr. Valeriano Alicea, ophthalmologist.   P. Exhibit 3, p. 43, l.19-25, p.44, l.1-25, p.46, l.1-25, p.56, l. 1-5; P. Exhibit 4, Q. 7, ¶3.

49. Due to the low customer flow during the first half hour of operation, sometime in 2013 or early 2014, PVSP started opening to the public at 9:30 am, instead of 9:00 am. Presently, PVSP opens at 10:00 am, like the rest of the stores. D. Exhibit 2, p. 201, l. 1-23.

50. From that moment on, Plaintiff worked from 9:30 am to either 6:00 or 6:30 pm, depending on the availability of her son to pick her up and whether there was any rush in the store. D. Exhibit 3, p. 103, l. 2-17.

51. At some point in 2013, the second meeting that Plaintiff had requested with Juarbe was held. D. Exhibit 3, p. 130, l. 5-16. In anticipation of that meeting, Plaintiff's son wrote down a list of the issues that she wanted to talk about during the meeting.   Plaintiff wanted to meet with Juarbe to ask him if Toperbee would honor the terms and conditions of her employment and prior fringe benefits granted by Luxottica.   Id., l. 1-24; p. 131, l. 1-11.   Among the many items on the list was: "[m]y reasonable accommodation has been in effect for 12 ½ and a half, where it stipulates that I can work until 6 in the afternoon and I have to work near my house on account of my visual condition.   Are you going to honor that agreement that I received by law?"   Exhibit 8 to D. Exhibit

_____

3.

52. The list in question was written some time before July 10, 2013. Exhibit 3, p. 133, l. 16-23. The list reflects that, before July 10, 2013, Juarbe had asked Plaintiff if she was willing to be relocated to a store in Caguas.   D. Exhibit 3, p. 134, l. 4-24; Exhibit 8 of Exhibit 3. He explained that employees were not permanently assigned to a specific store, that they could be relocated from one store to another upon the Company's operational needs.   D. Exhibit 3, p. 134, l. 20-24; p. 135, l. 1-3. Plaintiff answered that the Caguas store was too far and reminded him about her work schedule.   D. Exhibit 3, p. 135, l. 5-19.

53. Plaintiff and Juarbe did not discuss Plaintiff's work schedule had she been relocated to Caguas. Exhibit 3, p. 136, l. 21-24.   Plaintiff did not ask Juarbe about it.   D. Exhibit 3, p. 137, l. 1-7. Therefore, Plaintiff had no idea what her schedule and hours would have been if she had been relocated. Id.

54. After those two meetings, Plaintiff tried to meet again with Juarbe but it was not possible because he was busy.   Juarbe asked Plaintiff to meet either with her store manager or with Doris Santiago, Juarbe's assistant, but Plaintiff only wanted to talk to him, not to the manager or his assistant. D. Exhibit 3, p. 146, l. 2-24.

55. Plaintiff had no idea as to how many work related matters Juarbe had to deal with on a daily basis.   Because she was oblivious to Juarbe's specific reasons to postpone the meetings that she asked him for, she cannot claim that his

_____

reasons were not legitimate. D. Exhibit 3, p. 147, l. 1-11.

56. Plaintiff has no left eye vision. She wears glasses since she was eleven years old. D. Exhibit 3, p. 24, l. 19-24; p. 152, l. 12-18. With corrective lenses, her right eye vision is 20/20. D. Exhibit 3, p. 25, l. 3-8.

57. Pursuant to the medical advice of Plaintiff's doctor, since the year 2000, Plaintiff must avoid driving at night.   D. Exhibit 3, p. 87, l. 12-21; p. 153, l. 8-19.

58. On November 29, 2007, Plaintiff's ophthalmologist, Valeriano Alicea, issued a medical certification stating that Plaintiff must avoid driving after dusk.   D. Exhibit 2, p. 55, l. 15-25; p. 56, l. 1-5.   He also suggested that Plaintiff's employer should retain someone to drive her to, and from, her job site.   D. Exhibit 3, p. 303, l. 1-21.

59. Plaintiff got her first driver's license when she was 24 or 25 years old. Exhibit 3, p. 173, l. 14-22.   Since then, she has renewed it many times, the last time being June 2015.   D. Exhibit 3, p. 168, l. 10-13.

60. Plaintiff knew that, as a person with vision in only one eye and alleged driving limitations, she is subject to receive a license with legal restrictions, which may include daytime driving only.   Plaintiff was aware of that when she received her Florida's driver's license and when she renewed her Puerto Rico license in June 2015. D. Exhibit 3, p. 172, l. 22-24; p. 173, l. 1-8; l. 23-24; p. 174, l. 1-14.

61. On November 6, 2012, Plaintiff was licensed to drive in the state of Florida. D.

_____

Exhibit 3, p. 180, l. 15-19. In order for Plaintiff to obtain that, she was given a document that was completed by an optometrist.   Unlike the prior renewal procedures, where Plaintiff deliberately concealed her visual impairment (D. Exhibit 3, p. 170, l. 23-24; p. 171, l. 1-9, 17-20), this time Plaintiff revealed her medical condition to the optometrist. The optometrist submitted Plaintiff to the corresponding vision screening and ascertained no restrictions regarding Plaintiff's driving abilities (D. Exhibit 3, 182, l. 19-24; p. 183, l. 1-7) except for the use of corrective lenses and outside rearview mirror.   D. Exhibit 3, p. 181, l. 8-24; p. 182, l. 1-14.

62. Plaintiff's license to drive issued by the state of Florida is part of her personnel file.   D. Exhibit 3, p. 184, l. 22-24; 185, l. 1-14, 20-24; p. 186, l. 1-2. It is the most recent official document in Plaintiff's personnel file that sets forth information about her vision capabilities. D. Exhibit 3, p. 304, l. 18-22.

63. As part of the license renewal process in 2015, Plaintiff filled out the required forms. D. Exhibit 3, p. 167, l. 21-24; p. 168, l. 1-16. Plaintiff was aware of her obligation to complete said forms under penalty of perjury, a formality that compelled her to provide accurate and truthful information.   D. Exhibit 3, p. 168, l. 17-24; p. 169, p. 1-9. To complete her application, Plaintiff included the Medical Certification (form DTOP-DIS-260) that was given to her after she underwent the driver's vision screening. D. Exhibit 3, p. 169, l. 19-24; p. 170, l. 1-16. During the administration of said screening, Plaintiff never alerted the

_____

doctor about her left eye blindness even though she knew that the information was relevant to the driver's license renewal process.   D. Exhibit 3, p. 170, l. 23-24; p. 171, l. 1-9, 17-20.

64. During the renewal process for Plaintiff's 2015 license, she failed to disclose her visual impairment. D. Exhibit 3, p. 170, l. 23-24; p. 171, l. 1-9, 17-20. When she completed the required forms under penalty of perjury, Plaintiff left that information out because she wanted to get a driving license without restrictions, in order to be able to drive at night without facing the risk of being fined.   D. Exhibit 3, p. 177, l. 12-24; 178, l. 1-23.

65. The license to drive that Plaintiff renewed in June 2015 has only the following restriction: glasses or contact lenses.   It did not restrict Plaintiff's driving to day time only. D. Exhibit 3, p. 175, l. 20-24; p. 176, l. 1-17.

66. Plaintiff filed a charge before the Anti-Discrimination Unit ("ADU") on August 7, 2014 complaining of age and disability discrimination and lack of reasonable accommodation, because of her alleged visual impairment. The last discriminatory act referred to in the charge allegedly occurred on July 19, 2014. P. Exhibit 17.

67. Plaintiff felt discriminated because she requested a copy of Toperbee's Employee Handbook several times, both by email and in person, and Juarbe told her she was being annoying. D. Exhibit 3, p. 194, l. 18-24; p. 195, l. 1-24; p. 196, l. 1-2.

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 21
_____

68. Regarding this incident, Plaintiff admitted that, on more than one occasion, Juarbe explained to her that the reason he could not provide her with a copy of the handbook was because it needed an update. D. Exhibit 3, p. 201, l. 21-24; p. 202, l. 1-2.   Juarbe also told Plaintiff how to channel any inquiries regarding any employment issues; he mentioned that she could contact Doris Santiago, Jazmín Orta or himself. D. Exhibit 3, p. 202, l. 3-7.

69. Plaintiff was never reprimanded regarding this incident.   D. Exhibit 3, 195, l. 10-18. On the contrary, Juarbe thanked Plaintiff and acknowledged that her perseverance with this issue compelled him to update the handbook once and for all.   D. Exhibit 3, p. 196, l. 1-18.   On June 30, 2014, Plaintiff received a copy of the handbook and was aware of Toperbee's general prohibition against illegal discrimination.   D. Exhibit 3, p. 197, l. 17-24; p. 198, l. 1-24; p. 199, l. 1-3.

70. Plaintiff does not know if the rest of the employees in PVSP received a copy of the updated handbook before her. She just felt discriminated against because she sensed that Juarbe did not want to give her the handbook. D. Exhibit 3, p. 200, l. 23-24; p. 201, l. 1-20.

71. Plaintiff also complained that Juarbe treated her like a thief, treated her with contempt, refused meeting with her to sort things out, disregarded her requests, arbitrarily reprimanded her, would not trust her and deprived her of her commissions.   D. Exhibit 3, p. 202, l. 20-24; p. 203, l. 1-2.

72. Plaintiff admitted that, on July 19, 2014 there was a $100.00 shortage and Juarbe stated that it was unacceptable, and that the three employees who worked on that day –including Plaintiff- would be held accountable for the loss; that they had to replace the money. D. Exhibit 3, p. 203, l. 3-24; p. 204, l. 1-20, p. 208, l. 6-12.   Plaintiff tried but could not meet with him to discuss the incident. D. Exhibit 3, p. 205, l. 23-24; p. 206, l. 1-4. Juarbe never called Plaintiff a thief, nor requested her to replace the money.   D. Exhibit 3, p. 204, l. 21-24; p. 205, l. 1-5.   In fact, no one replaced the money.   D. Exhibit 3, p. 206, l. 7-13.

73. Plaintiff suffered no adverse action as a result of this incident.   D. Exhibit 3, p. 206, l. 1-20. The three employees implicated in this incident, two of which are younger than Plaintiff and have no apparent impairment, were treated equally by Toperbee. D. Exhibit 3, p. 205, l. 6-17.

74. Regarding Juarbe's alleged contemptuous treatment towards Plaintiff, she stated that on July 23rd 2014, she was working with another employee, Emmanuel Guzmán ("Guzmán").   D. Exhibit 3, p. 208, l. 23-24; p. 209, l. 1-2. While she was taking care of a patient and Guzmán was working on other matters, a man came into the store and stole seven (7) pairs of eyeware.   D. Exhibit 3, p. 209, l. 1-16; p. 223, l. 22-24; p. 224, l. 1.

75. As a result of that incident, both Plaintiff and Guzmán received written warnings.   D. Exhibit 1.   Also, as per Toperbee's Commissions Policy (which

_____

states that, in case of a shoplifting, the associates in the store will not be entitled

to earn commissions in that month) neither Plaintiff nor Guzmán received

commissions in July.

76. Guzmán is younger than Plaintiff, and at the time of the incident, was 23 old.

D. Exhibit 1, par. 16; D. Exhibit 3, p. 225, l. 4-9. Plaintiff felt discriminated

against by reason of age because of that memo.   See D. Exhibit 3, p. 225, l. 4-

9; p. 226, l. 5-24; p. 227, l. 1-2.   Plaintiff did not know that Guzmán also

received a warning as a result of the same incident.   D. Exhibit 3, p. 227, l. 4-

18.

77. Plaintiff also felt discriminated against because Michdali Mercado

("Mercado"), who was hired by Juarbe, was always observing what she was

doing.   D. Exhibit 3, p. 230, l. 11-21.   Although Plaintiff thought that

Mercado's observant behavior was more obvious with her, she does not know

if Mercado behaved the same way with the rest of the employees or why she did

it. D. Exhibit 3, p. 230, l. 22-24; p. 231, l. 1-16. p. 232, l. 5-6. D.   She does not

know if Juarbe, Doris Santiago or Jazmín Orta had instructed Mercado to do

that.   D. Exhibit 3, p. 231, l. 17-24; p. 232, l. 1-4. Mercado is not a company

official and Plaintiff does not hold Juarbe accountable for this incident. D.

Exhibit 3, p. 232, l. 20-24; p. 233, l. 1.

78. Plaintiff felt discriminated because, when she turned down the opportunity to

do Toperbee's medical billing and coding, she asked Juarbe when she would be

_____

considered for a salary increase, and Juarbe told her that no one was going to
receive such thing. D. Exhibit 3, p. 239, l. 17-24; p. 240, l. 1-21. He also
explained that Toperbee neither conducted annual performance evaluations
nor gave annual pay increases to its employees.   D. Exhibit 3, p. 241, l. 9-15.
Plaintiff felt mistreated because of that and because, when she asked Juarbe
why she would not receive a pay increase, he replied "next subject" and refused
to provide further explanations.   D. Exhibit 3, p. 247, l. 4-23.

79. Per Luxottica's business practices, Plaintiff received performance evaluations
and salary increases annually. Therefore, she expected Juarbe to follow the
same path.   D. Exhibit 3, p. p. 240, l. 13-24; p. 241, l. 1-8.

80. Plaintiff also felt discriminated against because Juarbe gave a pay increase to
Ms. Mayrim[2].   Ms. Mayrim's pay rate was $10.50 per hour while Plaintiff
earned $10.22 per hour.   Ms. Mayrim was studying to become an optician. D.
Exhibit 3, p. 242, l. 10-19; p. 243, l. 15-24; p. 244, l. 1-13. Plaintiff concedes that
the functions of an optician in training or a licensed optician are different from
those of an optometrist assistant, as an optician performs functions that an
optometrist assistant cannot do. D. Exhibit 3, p. 37, l. 11-22.

81. Plaintiff is oblivious to the reasons why Ms. Mayrim received a pay increase,
and she did not.   Exhibit 3, p. 246, l. 14-16.   Toperbee decided to give a pay
raise to Ms. Mayrim to give her incentive because she was studying to become

_____

[2]  No last name was provided by Plaintiff in her deposition for this employee.

an optician and Toperbee wanted to retain her as part of its work force.   D. Exhibit 2, p. 180, l. 20-25; p. 181, l. 1-3; p. 203, l. 5-15.   D.   Ms. Mayrím was given the same salary which is paid to all licensed opticians at Toperbee, and was the only associate to receive an increase in PVSP.   D. Exhibit 2, p. 181, l. 1-3, 11-16.

82. Licensed opticians are hard-to-fill job positions.   There is a shortage of licensed opticians in Puerto Rico.   D. Exhibit 2, p. 148, l. 5-6; p. 181, l. 1-3.

83. Plaintiff also felt discriminated because, on August 4, 2014, she received a memo from Juarbe regarding an apparent $40.00 shortage on July 25, 2014. Plaintiff balanced the cashier on that day and noticed the discrepancy, which was linked to a transaction that she made in a patient's account. D. Exhibit 3, p. 248, p. 19-24; p. 249, l. 1-10, 17-24.

84. Plaintiff alerted her manager Jazmín Orta about the situation and had a telephone conversation with Juarbe during which she tried to explain to him that the apparent shortage was nothing but a system glitch, to which Juarbe answered back, with a loud tone, that such incidents were not supposed to happen and that he was not going to tolerate them.   D. Exhibit 3, p. 254, l. 22-24; p. 256, l. 1-24; p. 257, l. 1-15.

85. Plaintiff does not know if Juarbe speaks to other employees with the same loud tone as he speaks to her.   D. Exhibit 3, p. 257, l. 16-24.

_____

86. A print out from the patient's record showed as if Plaintiff had credited a payment with a Visa ending in *5599 in the amount of $40.00 dollars to the patient's account balance, even though the patient had not made such payment. D. Exhibit 3, p. 252, l. 8-18.

87. Consistent with that, the settlement report generated by the credit cards terminal at the end of the day did not reflect the corresponding charge in that amount.   D. Exhibit 2, p. 92, l. 14-25; p. 98, l. 1-25.   Plaintiff received a memo as a result of this incident.   D. Exhibit 2, p. 198, l. 17-25; p. 199, l. 1-19.

88. Plaintiff suffered no adverse employment action as a result of that incident, and the terms and conditions of her employment were not affected negatively. The August 4, 2014 memo that she deems as an act of discrimination did not warn her of any further disciplinary action if the same incident recurred. D. Exhibit 3, p. 258, l. 1-11.

89. Plaintiff felt discriminated because, during certain months, neither she nor the rest of the associates were paid commissions because issues with health insurance providers resulted in a write off of accounts receivables.   D. Exhibit 3, p. 260, l. 20-24; p. 261, l. 1-14.

90. Additionally, she felt discriminated because, on January 2014, she was not paid certain commissions that she expected to receive. She did not claim them at that time. D. Exhibit 3, p. 263, l. 4-24; p. 264, l. 1-5.

91. At that time, the commissions were calculated by Mercado or Jazmín Orta and sent to the administrative office for payment. D. Exhibit 3, p. 264, l. 21-24; p. 265, l. 1-5. Plaintiff brought her concern to the store manager, Orta, who supposedly met with Juarbe to discuss the situation but Plaintiff does not know what happened.   D. Exhibit 3, p. 266, l. 7-24; p. 267, l. 1-11. Plaintiff never brought her concern to Juarbe or to Doris Santiago. D. Exhibit 3, p. 267, l. 12-17; p. 268, l. 20-24; p. 269, l. 1-10.

92. Plaintiff felt discriminated because when the sales were low, she was sent home early although she had more seniority and, according to her understanding of Toperbee's policy, employees with less seniority were the first ones to leave on such occasions. D. Exhibit 3, l. 271, l. 6-16. However, Plaintiff concedes that because she was not able to cover the closing shifts, the right thing to do to control payroll overhead on days with low sales was keeping the employees who were able to cover all the shifts.   D. Exhibit 3, p. 272, l. 1-8.

93. Regarding Plaintiff's allegation that she felt discriminated because, on January 2014, she was not paid certain commissions that she expected to receive, she never brought that issue to Juarbe's attention, and his recollection is that PVSP's manager did not discuss it with him either.   If Plaintiff had put Juarbe on notice of said situation, he would have sorted it out.   D. Exhibit 1, ¶ 22.

94. According to Toperbee's Employee Handbook, there might be days when the Company understands that the low volume of sales does not justify continuity

_____

of an employee on his/her shift, and the Company may require an employee to terminate his/her shift before the stipulated time in its schedule, without obligation of additional payment to the hours already worked. Exhibit 1, ¶ 20.

95. Although the above mentioned rule makes no reference to Plaintiff's contention, she states that employees with less seniority had to be the first ones to be let go on such days. However, seniority cannot be a conclusive factor in these situations. If a senior employee is working during a day with low sales volume but is not available to work until the store closes, the right thing to do to control payroll overhead on such days is to retain the employees who are able to stay until the conclusion of operations. Toperbee's rule on this regard is neutrally implemented and is based on the assumption that the employees working on such days are available to work throughout the store's hours of operation. D. Exhibit 1, ¶ 21.

96. In April 2014, Plaintiff was offered the opportunity to do medical billing and coding for Toperbee. As per the offering, she would be working in Toperbee's administrative offices, Monday through Friday, from 8:00 am to 5:00 pm, and with weekends off.   D. Exhibit 3, p. 235, l. 6-24; p. 236, l. 1-24; p. 237, l. 1-24; p. 238, l. 1-24.

97. Although the job proposition accommodated Plaintiff's desire not to drive at night, she turned it down without much deliberation, and did not give herself a chance to see whether this change would be a better fit for her demands. D.

Exhibit 3, p. 236, l. 17-24; p. 237, l. 1-24; p. 238, l. 1-24; p. 281, l. 17-24; p. 282, l. 1-9.   Plaintiff turned it down mainly because if she accepted it, she would keep the same salary but she would no longer be entitled to commissions. D. Exhibit 3, p. 237, l. 11-13.

98. Plaintiff was offered the opportunity to do medical billing and coding from her home, but she also turned it down because she did not have a computer. Although Juarbe offered to provide her a computer, she rejected the opportunity.   D. Exhibit 2, p. 117, l. 6-18; p. 197, l. 19-25; p. 198, l. 1-2.

99. On September 4, 2014, Plaintiff was informed by Doris Santiago that she was going to be relocated to another store in Caguas where they would be able to grant her request for a 9:00 am to 6:00 pm working schedule.   D. Exhibit 3, p. 273, l. 5-12; p. 276, l. 16-22; p. 277, l. 2-18; p. 290, l. 12-18, and Exhibit 18B to D. Exhibit 3.

100.   Shortly thereafter, without knowing the details of her transfer, on September 10, 2014, Plaintiff quit her job with Toperbee. D. Exhibit 3, p. 278, l. 19-24; p. 279, l. 1-4.

101.   Regarding Plaintiff's relocation to Caguas, Juarbe would have considered implementing a flexible work schedule that would allow Plaintiff to work fewer hours during the week so that she could leave work before 6:00 pm. She could work a few additional hours on Saturdays to complete her full time schedule. Reducing her meals period to 30 minutes so that she could leave work at 5:30

pm was another alternative, among others, that Juarbe was willing to consider, but Plaintiff did not give him a chance to discuss it. D. Exhibit 2, p. 122, l. 1-14.

102.    Driving from Plaintiff's home to San Patricio would take her around 18 minutes, while driving to Caguas would take her 38 minutes, an additional 20 minutes.   P. Exhibit 3, p. 137, l. 1-25; p. 138, l. 1-25; p. 139, l. 1-22.   San Patricio is a 13 km (8 mile) from Plaintiff's home, while Caguas is a 38 km (23 mile) commute.   Id.   Plaintiff acknowledges that the fastest route from Caguas to Toa Baja would take her 32 minutes.   Id.

103.    Plaintiff concedes that using public transportation was a safe alternative to avoid night driving and nothing prevented her from doing that. However, she did not consider that alternative because Luxottica had already approved her 9:00 am to 6:00 pm work schedule.   D. Exhibit 3, p. 284, l. 8-24; p. 285, l. 1-21.

104.    Plaintiff concedes that Toperbee tried to find ways to suit her demands but she turned them down.   D. Exhibit 3, p. 284, l. 12-17.

105.    Plaintiff has no idea how Toperbee would have been affected if it had continue to strictly enforce the work schedule that she sought for exclusively in the PVSP store.   D. Exhibit 3, p. 287, l. 17-24; p. 288, l. 1.   However, she admits that her not being able to do closing shifts meant that the other two full-time employees (who had different personal circumstances and needs) had a disproportionate burden as they would end up closing the store more days than

under normal circumstances.   D. Exhibit 3, p. 288, l. 2-9; 18-21; D. Exhibit 2, p. 120, l. 8-23.

106.    Juarbe decided to relocate Plaintiff to Plaza del Carmen in Caguas because that store does not operate during night shifts (past 6:00 p.m.).   Since every employee in Plaza del Carmen basically had the same daytime work shift, it is where Plaintiff's request for a specific schedule could have being honored without imposing an undue burden among the rest of the employees.   D. Exhibit 1, p. 24.

107.    According to Juarbe, it was feasible for Luxottica to implement Plaintiff's requested work schedule because Luxottica had more employees to cover its operational needs.   Toperbee, however, had significantly fewer employees, each one assigned exactly where it was needed. Toperbee did not have spare or floater associates who could rotate from store to store to cover the shifts that other employees were not willing to take.   D. Exhibit 2, p. 127, l. 6-19.

108.    Plaintiff filed her first charge before the ADU in August 2014.   On September 4, 2014, Plaintiff filed a second charge before the ADU, claiming that she was retaliated against when she was informed by Doris Santiago that she was going to be relocated a Caguas where Toperbee would be able to grant her request for a 9:00 am to 6:00 pm working schedule. D. Exhibit 3, p. 273, l. 5-12; p. 276, l. 16-22; p. 277, l. 2-18.

109.    Plaintiff admits that the possibility of her relocation to Caguas was discussed with her before July 10, 2013, almost a year before she filed her first administrative complaint. D. Exhibit 3, p. 274, l. 8-17; 290, l. 12-18 and its Exhibit 18-B.

110.    Plaintiff felt that she could not perform her job as she wanted because of the incidents she discussed in her deposition.   D. Exhibit 3, p. 287, l. 1-10. Nevertheless, she felt at ease at work.   D. Exhibit 3, p. 286, l. 23-24; p. 287, l. 1-3.

111.    Plaintiff resigned on September 10, 2014. She personally delivered her resignation letter to Juarbe.   Exhibit 3, p. 278, l. 19-24; p. 279, l. 1-4.

112.    When Plaintiff tendered her resignation letter, she had already been offered employment with Optiqus approximately two or three months before.   D. Exhibit 3, l. 291, l. 3-19, p. 294, l. 7-12.

113.    Plaintiff had been actively seeking for employment since January 2014, approximately nine months before she decided to leave her job at Toperbee. D. Exhibit 3, p. 295, l. 3-22.

114.    Plaintiff would be willing to return to Toperbee to work with Juarbe and his team if she was guaranteed a position at PVSP with a 9:00 am to 6:00 pm schedule.   D. Exhibit 3, l. 286, l. 10-22.

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 33
_____

# LEGAL ANALYSIS

## A. ADA.

### 1. Disability.

The ADA was enacted to "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).    The ADA prohibits discrimination "against an otherwise qualified individual on the basis of disability." 42 U.S.C. § 12112(a); see also Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19-20 (1st Cir. 2004).

Thus, in order to establish a claim under the ADA, Plaintiff must bring forth facts showing that: (1) she was a disabled individual within the meaning of the ADA; (2) she was qualified to perform the essential functions of the job, either with or without reasonable accommodations; and (3) Defendants took adverse action against her because of her disability.   Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1166 (1st Cir. 2002).

"Disability" is a term of art under the ADA, and must be established via a three part test first enunciated by the Supreme Court in Bragdon v. Abbott, 524 U.S. 624, 631, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).   Plaintiff must first establish that she suffers from a physical or mental impairment.   Ramos-Echevarría v. Pichis, Inc., 659 F.3d 187 (1st Cir. 2011).   Second, she must demonstrate that the condition affects life activities that are "major," i.e., "of central importance to daily life." Id.   Finally, she must tie the first two prongs together by showing that the impairment "substantially limits" the identified major life activity.   Id.; see also Arroyo-Ruiz v. Triple-S Mgmt. Grp., No. 15-1741, 2016

_____

WL 4734351, at *5 (D.P.R. Sept. 12, 2016).

"Impairment" is defined by the EEOC as "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or any mental or physiological disorder, such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disabilities." See 29 C.F.R. § 1630.2(h) (2012).

Major life activities on the other hand, include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working". 29 C.F.R. § 1630.2(i); Ramos-Echevarría, 659 F.3d at 187. In assessing whether someone is disabled according to the ADA, the Court must make an individualized inquiry in every case. Id.

In 2008, the ADA was then amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"). As previously stated, one of the pre-2008 requirements was that a claimant show the impairment he or she suffered from "substantially limited" an identified major life activity. This term, however, had previously been interpreted by the Supreme Court in a very restricted fashion. With the passing of the ADAAA in 2008, Congress chastised the courts for "interpret[ing] the term 'substantially limits' to require a greater degree of limitation than was intended by

_____

Congress," thereby "eliminating protection for many individuals whom Congress intended to protect."   Pub. L. No. 110-325, §§ 2(a)(4), (a)(7), (b)(5), 122 Stat. 3553 (stating that the Supreme Court "created an inappropriately high level of limitation necessary to obtain coverage under the ADA").   The ADAAA also scolded the EEOC for "expressing too high a standard" in its regulations defining the term "substantially limits" to mean "significantly restricted." Pub. L. No. 110–325, § 2(a)(8), 122 Stat. 3553.

As a result thereof, the EEOC proceeded to revise its definition of what "substantially limits" is for ADA purposes, and implemented regulations to remove the requirement that an impairment "prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting."   See 29 C.F.R. § 1630.2(j)(1)(ii).   The EEOC's post-ADAAA regulations also state that the term "'substantially limits' is not meant to be a demanding standard," and shall be "broadly construed in favor of expansive coverage[.]" 29 C.F.R. § 1630.2(j)(1)(i). Thus, the ADAAA has lowered the bar for establishing a disability in general.   See Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 87 n. 6 (1st Cir. 2012) (describing the amended definition of "disability" as "more generous"); and García-Hicks v. Vocational Rehab. Admin., 148 F. Supp. 3d 157, 165 (D.P.R. 2015).

Although the language of the ADAAA and the EEOC's implementing regulations provide important guidance, the task of defining the new "substantially limits" requirement under the post-ADAAA standard still falls to the courts.   Unfortunately, there is little case law in the First Circuit interpreting the scope and meaning of a

"substantial limitation" on a major life activity under the ADAAA.   Thus, the Court is left with applying limitations contained in old case law to a new standard.   With this less stringent standard in mind, the Court analyzes the case at bar, and finds that Plaintiff has not established that she was disabled under the ADA.

The Court first addresses the issue raised by Plaintiff in her opposition, that Defendants accepted that Plaintiff was "disabled" within the meaning of the ADA.   In Defendants' Motion for Summary Judgment, the Court notes that Defendants state, at footnote 1 on page 2, that "we will not contest that Plaintiff has a visual impairment". Then on page 10, Defendants state that "for purposes of the summary judgment argument, Toperbee will accept that Castro had a disability within the meaning of the ADA".   Disability and impairment, however, are two very different things, because one can have an impairment yet not be disabled under the ADA.

As stated before, the ADA defines disability as a physical or mental impairment that substantially limits one or more major life activities.   Thus, in order to be found disabled, a Plaintiff must first show he or she has in impairment, and that said impairment limits a major life activity; that is a *prima facie* requirement to be found disabled, as that term of art is used by the ADA.   In spite of Defendant's *faux pas*, it is evident that Defendants made an inadvertent mistake in admitting Plaintiff had a disability, insofar as the remainder of their brief regarding this issue argues that Plaintiff does not have a *disability* as defined by the ADA, because her *impairment*, which they do accept, does not limit her in a major life activity.   Defendants later clarified that they

_____

committed a mistake in stating that they admitted she had a disability, when they meant to admit she had an impairment.   Thus, the Court takes for granted, as Defendants do, that Plaintiff suffers from an impairment.

Having cleared the impairment hurdle, the Court then moves on to the second element of the law's first requirement - that the impairment limits a major life activity. It has been clearly established that by itself, having an impairment is insufficient to prove a disability as defined by the statutes under which a claimant seeks relief. "What is required is evidence showing that the impairment limits this particular plaintiff to a substantial extent."   Ramos-Echevarría, 659 F.3d at 187; see also Dutcher v. Ingalls Shipbuilding, 53 F.3d 723, 727 (5th Cir.1995) ("A physical [or mental] impairment, standing alone, is not necessarily a disability as contemplated by the ADA," this impairment must substantially limit a major life activity); Muller v. Automobile Club of Southern California, 897 F.Supp. 1289, 1297 (S.D.Cal. 1995) (plaintiff's psychological problems alone, absent some showing that the problem substantially limited her major life activities, does not qualify plaintiff as disabled under the ADA).

Furthermore, Courts require a plaintiff to specify the major life activity in which he claims to be substantially limited.   Ramos-Echevarría, 659 F.3d at 188.   "The need to identify a major life activity that is affected by the plaintiffs impairment plays an important role in ensuring that only significant impairments will enjoy the protection of the ADA."   Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 152 (2d Cir. 1998).   Although the instant Complaint is hazy in its details of exactly what major life

activity is being affected, the Court will assume the major life activity affected by Plaintiff's

impairment is night driving (or night blindness[3]).

Examining the record as a whole, even under the new less stringent standard, the

Court finds that Plaintiff's claims do not meet the threshold to be considered disabled

under the statute.   In the first instance, the Court cannot say that Plaintiff's condition

alone constitutes a disability.   Plaintiff has only shown that she cannot drive after dusk.

There is little case law on the issue of whether an individual with night blindness is

disabled within the meaning of the ADA.   Because the Supreme Court has instructed that

the determination of the existence of a limitation on a major life activity must be

determined on a case-by-case basis, an individualized assessment is necessary, but

comparing the facts here to facts and findings from other Courts, the fact that Plaintiff

cannot drive at night, by itself, is insufficient.   See Bancale v. Cox Lumber Co., 1998 WL

469863 at *3 (M.D.Fla. May 18, 1998)(Court granted summary judgment dismissing an

ADA claim where the plaintiff's night blindness prevented him from driving at night but

there was "simply no record evidence that any other activities are affected at night"); and

Schwarz v. Northwest Iowa Cmty. Coll., 881 F.Supp. 1323, 1342–44 (N.D. Iowa 1995)

(rejecting night blindness disability claim under Iowa law, because alleged disability

would not impair plaintiff's ability to perform other jobs during daylight hours).

---

[3]   See Docket No. 26, Amended Complaint *e.g.*; In 2002, "Pearle Vision of Puerto Rico" wrote a letter to Plaintiff approving her solicitation to end her shift 30 min earlier due to her visual disability ¶14; Dr. Valeriano Alicea Cruz, Plaintiff's ophthalmologist, stated that "she must avoid driving after dusk" ¶16; Plaintiff had no conflicts due to working hours because the shifts ended at 5:30 p.m. or before, ¶ 18; Plaintiff worked at the Montehiedra store for only two days because it was an unreasonable risk driving after dusk, ¶19; regarding Plaintiff's eyesight, Dr. Alicea Cruz stated in a questionnaire "no driving after dusk, no machinery" and that "she should be leaving home before dusk" ¶24.

In Capobianco v. City of N.Y., 422 F.3d 47, 58 (2d Cir. 2005), the Court of Appeals for the Second Circuit overturned the grant of summary judgment, finding that a reasonable jury could find that an individual could be disabled because: he was unable to safely walk, run, or ride a bicycle outdoors at night, except in the most familiar and well-lit surroundings; had extreme difficulty finding a seat in a dark movie theater or restaurant; had to avoid altogether or plan with great care independent excursions in the evening twilight, lest he find himself outdoors alone as night falls; and was severely restricted in terms of outdoor nighttime activities in general.   These are very different facts from what has been presented in this case.   Here, Plaintiff has only alleged she cannot drive at night, and nothing more.    This is insufficient.

Even under the most generous reading of the statute under the new regulations, and analyzing instead whether that Plaintiff was limited in the major life activity of seeing[4], her claim would still fail.   Her impairment does not severely restrict use of her overall eyesight compared with how the average unimpaired person normally uses his or her eyesight in daily living.   See 29 C.F.R. § 1630.2(j)(1)(ii)("[a]n impairment is a disability within the meaning [of the ADA] if it substantially limits[5] the ability of an individual to perform a major life activity as compared to most people in the general population").   It is evident that Plaintiff can drive and perform her duties at Pearle

---

[4]  Characterized as a "basic ability" by the Supreme Court in Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197, 122 S. Ct. 681 (2002) (overturned due to legislative action on other grounds, 2009) and as a major life activity by statute.   29 C.F.R. § 1630.2(i).

[5]  This is even considering that the EEOC's post-ADAAA regulations also state that the term "'substantially limits' is not meant to be a demanding standard," and shall be "broadly construed in favor of expansive coverage[.]" 29 C.F.R. § 1630.2(j)(1)(i).

during the day without any accommodation whatsoever, and was even offered an opportunity to perform billing and coding, which requires heavy reading.

Other plaintiffs asserting visual impairment claims under the ADA have had a difficult time establishing a disability with more conditions than what Plaintiff herein has alleged. See, e.g., Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 99-103 (2d Cir. 2003) (affirming grant of summary judgment dismissing ADA claim brought by bus driver who was color blind); EEOC v. United Parcel Serv., Inc., 306 F.3d 794, 803 (9th Cir. 2002) (affirming summary judgment dismissing disability claims of "monocular" individuals whose vision impairments did not keep them from driving, reading, using tools, and playing sports, finding no substantial limitation on major life activity of seeing); Sherman v. Peters, 110 F.Supp.2d 194, 199-200 (W.D.N.Y.2000) (granting summary judgment dismissing claim under Rehabilitation Act brought by plaintiff who had lost one eye); Kirkeberg v. Canadian Pac. Ry., 619 F.3d 898, 904-905 (8th Cir. 2010) (holding that plaintiff's monocular vision was not disability under ADA because tiring more easily and finding it more difficult to navigate on foot does not rise to level of substantial limitation where plaintiff could read fairly easily and drove with no trouble); Szmaj. v. American Tel. & Tel. Co., 291 F.3d 955, 957 (7th Cir. 2002) (holding that plaintiff's congenital nystagmus, which made it difficult for him to focus his eyes and prevented him from holding a job in which he had to spend more than 50% of his time reading, was not a disability under ADA because ability to read all day long is not a major life activity); Still v. Freeport-McMoran, Inc., 120 F.3d 50, 52 (5th Cir. 1997) (holding that, even though

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 41
_____

plaintiff was blind in one eye and had limited peripheral vision, his partial blindness did not substantially limit his sight because he was able to perform normal daily activities, like driving cars); Overturf v. Penn Ventilator, Co., Inc., 929 F.Supp. 895, 898 (E.D.Pa. 1996) (holding that tumor behind one eye which caused double, and sometimes triple vision, and resulted in loss of peripheral vision was not a disability under the ADA because he could compensate by adjusting his line of vision and perform tasks of his job, drive car, watch television, and read).

Even under the now more generous reading of disability under the ADAAA, Plaintiff has presented no other issue with her vision other than she cannot drive after dusk.  Plaintiff has not detailed how, if in any way, she is limited in seeing in general. Plaintiff's claim is therefore insufficient to meet the statutory requirement.

Finally, some Courts have considered whether the fact that an individual has a driver's license and whether an individual is able to read are appropriate considerations when determining if the individual is substantially limited in the major life activity of seeing.  Foore v. City of Richmond, Va., 6 Fed.Appx. 148, 152 (4th Cir. 2001) (finding that, although the plaintiff had monocular vision, he compensated for his monocular vision and was not substantially limited in seeing, evidenced by the fact that he had a full range of peripheral vision, could read, and had a driver's license); Wyatt v. Maryland Institute, 2012 WL 739096, at *6, 2012 U.S. Dist. LEXIS 30465, at *21-22 (finding that the plaintiff's glaucoma did not substantially limit his major life activity of seeing because he had the use of both of his eyes, and continued to drive during the day and night).

_____

Here, Plaintiff had both a Florida driver's license and a Puerto Rico driver's license for some time[6].   Irrespective of whether or not Plaintiff told the license examiner of her eye condition, and regardless of what the examiners put on the forms, the end result is that the Florida license contained no restrictions whatsoever.   Clearly Plaintiff was examined by an optometrist in her license renewal process, yet, no night time restrictions were placed on her licenses. Plaintiff's latest driver's license obtained in Puerto Rico in 2015 only had restrictions for glasses and contact lenses.   It did not restrict her driving to only daytime driving.   This further mitigates against her case.

In light if this analysis, it is evident that Plaintiff has been unable to meet the first prong of the analysis.   Although Plaintiff suffers from an impairment, her impairment does not limit her in a basic life activity, and thus, is not disabled individual within the meaning of the ADA.   Therefore, Plaintiff's claim cannot lie and Defendants' Motion for Summary Judgment is GRANTED.

### 2. Failure to Accommodate.

The First Circuit has noted that "[t]he federal statutes barring discrimination based on disability do more than merely prohibit disparate treatment; they also impose an affirmative duty on employers to offer a 'reasonable accommodation' to a disabled employee." Calero-Cerezo, 355 F.3d at 19-20.   Disability discrimination under the ADA is defined to include "not making reasonable accommodations to the known physical or

_____

[6] Plaintiff objects to this evidence indicating it "is mostly hearsay".   The court fails to see how an official Florida or Puerto Rico driver's license is hearsay under the Federal Rules, even more so when they were also a part of Plaintiff's official record with Human Resources at Toperbee.

_____

mental limitations of an otherwise qualified individual with a disability ... unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); see Reed v. LePage Bakeries, Inc., 244 F.3d 254, 257 (1st Cir. 2001); Maldonado-Ortiz v. Lexus de San Juan, 775 F.Supp.2d 389, 407 (D.P.R. 2011).

To prevail on a reasonable accommodation claim under the ADA, a plaintiff must show: (1) that she is disabled within the meaning of the ADA; (2) that she was able to perform the essential functions of her job, either with or without a reasonable accommodation; and (3) that, despite his employer's knowledge of his disability, the employer did not offer a reasonable accommodation for the disability.   Calero-Cerezo, 355 F.3d at 20; Torres-Almán v. Verizon Wireless P.R., Inc., 522 F.Supp.2d 367, 385 (D.P.R. 2007).

The Court has already discussed that Plaintiff failed to meet the disability prong, which effectively bars this claim as well.   Assuming *arguendo*, however, that such a showing of a disability could be made, Plaintiff would still fail the third prong, to wit, that Defendants failed to provide her with a reasonable accommodation.

Under the ADA, the term "reasonable accommodation" may include, inter alia, "job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 44
_____

disabilities." 42 U.S.C. § 12111(9)(B).   This list notwithstanding, "[t]he use of the word

'reasonable' as an adjective for the word 'accommodate' connotes that an employer is not

required to accommodate an employee in any manner in which that employee desires."

Lewis v. Zilog, Inc., 908 F.Supp. 931, 947 (N.D.Ga. 1995).   Courts have found that the

word "reasonable" would be rendered superfluous in the ADA if employers were required

in every instance to provide employees "the maximum accommodation or every

conceivable accommodation possible."   Lewis, 908 F.Supp. at 947; see also Vande Zande

v. State of Wis. Dept. of Admin., 851 F.Supp. 353, 360 (W.D.Wis. 1994) ("an employee is

entitled only to a reasonable accommodation and not to [a] preferred accommodation"),

aff'd, 44 F.3d 538 (7th Cir. 1995).   Therefore, a qualified individual with a disability for

ADA purposes is "not entitled to the accommodation of her choice, but only to a

reasonable accommodation." Lewis, 908 F.Supp. at 948.

        In the case at bar, the record is quite clear that Plaintiff was offered a plethora of

accommodations[7], and she refused them all.   First, because of Plaintiff's alleged good

record, she was offered the opportunity to become manager of the store.   Plaintiff

declined, stating it was too demanding.   In July, 2013, Plaintiff refused an offer to work

at a Caguas store because it was further away from home.   This date is important because

it will have direct relevance to the act that led to Plaintiff's resignation – her transfer to

this same store over a year later.   In any event, Plaintiff refused the transfer without

_____

[7] A term the Court uses here for lack of a better word and not meant to denote any term of art, as said term would be
used under the ADA.

inquiring whether any change to her schedule could be made.   At that time, Defendants did not transfer her.

In April, 2014, Plaintiff was offered the opportunity to do medical billing and coding at Defendants' administrative offices, Monday through Friday, from 8:00 a.m. to 5:00 p.m.   Although this clearly would have solved Plaintiff's problem, she declined because she would no longer be able to collect commissions.   Plaintiff was later offered the opportunity to do the same from her home.   Again, she declined, alleging then that it had to be done after hours and would leave her insufficient personal time.   Plaintiff also averred she had no computer and Toperbee offered to get her one.   She still refused the offer.

Finally, Defendants decided to relocate her to the Plaza del Carmen Mall store, which closes at 6:00 p.m. and thus explicitly granted her request.   Since the store was further away from Plaintiff's home, however, this was also unacceptable to her as she would be driving a longer amount of time.

Defendants respond with several justifications, mainly, that Plaintiff's desired schedule for the San Patricio store was onerous for the company.   Indeed, Plaintiff admits that her not being able to do closing shifts meant that the other two full-time employees (who had different personal circumstances and needs) had a disproportionate burden, insofar as they would end up closing the store more days than under normal circumstances.   Furthermore, Plaintiff has no idea how Toperbee would have been affected if it had continued to enforce the work schedule that she sought for exclusively in

the San Patricio store.

The Plaza del Carmen Mall transfer was less onerous for Defendants because the store operated from only 9:00 a.m. until 6:00 p.m. and it did not have night shifts.   Thus, since every employee in Plaza del Carmen Mall had the same daytime work shift, it is where Plaintiff's request for a specific schedule could have been honored without imposing an undue burden among the rest of the employees and the company.   This is a legitimate justification that the Court cannot overlook.

In a Catch-22 situation, while Plaintiff avers that Defendants never gave her a chance to prove whether or not her requirement to have her leave earlier was onerous, Defendant posits that Plaintiff never gave them a chance to see whether an alternative schedule in Caguas was possible because she resigned before the transfer could be implemented and she never discussed any alternatives with them.   In any event, besides the undue burden that Plaintiff's petition created for the company, the record is clear that Toperbee offered several different accommodations to Plaintiff and she rejected all of them.   Again, the accommodation that must be provided is not the one that a plaintiff seeks, but rather a reasonable one.   Defendants have amply demonstrated that they did so here.

Finally, Plaintiff attempts to make an issue over the fact that, pursuant to the Asset Purchase Agreement, Toperbee was obligated to honor the terms and conditions the employees had previously enjoyed under Luxottica, and that Plaintiff had a reasonable accommodation previously granted to her.   However, the Asset Purchase Agreement

merely states that the employment offers made to the employees must be *similar or substantially similar* to those they had under Luxottica.   As described above, Plaintiff was offered a plethora of different accommodations, some of them even vastly different and more beneficial to her, such as being general manager of the store and doing billing and coding from 8:00 a.m. to 5:00 p.m. at the administrative offices.   The last one of these scenarios contemplated specifically what Plaintiff asked for, a day schedule from 9:00 a.m. to 6:00 p.m.   The Court cannot agree with Plaintiff that this was not substantially similar to what she had in San Patricio, the only difference being additional distance from her home.

On these facts, the Court cannot find a failure to accommodate claim.   As such, Defendants' Motion for Summary Judgment is GRANTED as to this issue.

### 3.  Retaliation.

In order to make out a *prima facie* case of retaliation, Plaintiff must prove that (1) she engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3) the adverse action was causally connected to the protected activity. Hernández-Torres v. Intercontinental Trading, Inc., 158 F.3d 43 (1st Cir. 2007).   While it is undisputed that Plaintiff engaged in protected conduct by Title VII when she filed his EEOC claim, and Defendants so concede, the Court cannot find she that he suffered an adverse employment action as a result of Defendants' conduct.

It has been well established that "The alleged retaliatory action must be material, producing a significant, not trivial, harm." Carmona–Rivera v. Commonwealth of Puerto

_____

Rico, 464 F.3d 14, 19 (1st Cir.2006). "'Context matters,' and 'the standard is tied to the challenged retaliatory act, not the underlying conduct that forms the basis of the [discrimination] complaint.'" Id. (citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 69-70, 126 S. Ct. 2405 (2006). The First Circuit has held that "adverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" Marrero v. Goya of P.R., Inc., 304 F.3d 7, 23 (1st Cir. 2002) (quoting White v. New Hampshire Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000)). Whether an action is sufficient to support a claim of retaliation is judged objectively and depends on the particular circumstances of each case.   Burlington Northern, 548 U.S. at 69, 126 S.Ct. 2405; Marrero, 304 F.3d at 23, and Canales v. Potter, 614 F. Supp. 2d 213, 218 (D.P.R. 2009).

Plaintiff avers in the instant case that Defendant retaliated against her by transferring her to the Caguas' store after she filed her charge with the EEOC and that this was somehow an adverse action.   The Court cannot so find.   Setting aside for a minute that the possibility of this transfer had been discussed and offered to Plaintiff over a year before, the only difference is that Plaintiff would have had to commute for a little longer. Defendants are correct in stating that this issue alone is not enough to conclude that she suffered a material harm.

A transfer to another store twenty (20) minutes further away from her home is hardly the type of conduct that case law has held constitutes an adverse employment

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 49
_____

action, not even considering Plaintiff's condition.   The clear trend of authority is that a

purely lateral transfer, that is, a transfer that does not involve a demotion in form or

substance, cannot rise to the level of a materially adverse employment action.

Ledergerber v. Stangler, 122 F.3d 1142, 1144 (8th Cir. 1997); *accord* Kocsis v. Multi–Care

Management, Inc., 97 F.3d 876, 885 (6th Cir. 1996) ("[R]eassignments without salary or

work hour changes do not ordinarily constitute adverse employment decisions in

employment discrimination claims.").   Similarly, a transfer or reassignment that

involves only minor changes in working conditions, like here, normally does not

constitute an adverse employment action. See Jones v. Fitzgerald, 285 F.3d 705, 714 (8th

Cir. 2002); Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132, 136 (7th Cir. 1993);

Marrero, 304 F.3d at 23.   Thus, the Court cannot find that the transfer at issue here was

a "materially adverse change" in the terms and conditions of Plaintiff's employment.

Furthermore, Defendants have established that they would have been willing to

consider other alternatives, such as a flexible work schedule that would allow Plaintiff to

work fewer hours during the week so she could leave before 6:00 pm, allowing her work

additional hours on Saturdays to complete her full time schedule, or reducing her meals

period to thirty (30) minutes so that she could leave work at 5:30 pm.   Since Plaintiff

resigned immediately after the transfer, she did not give the company any time to consider

these alternatives.

The Court cannot find that Plaintiff's relocation to Plaza del Carmen was retaliatory

in nature; on the contrary, it was reasonable alternative to accommodate Plaintiff's

request for a permanent daytime schedule.    Plaintiff declined the offer as she did with all others.

Accordingly, Defendants' Motion of Summary Judgment of the retaliation claims is GRANTED.

### 4.  Law 44.

Puerto Rico Law 44 was modeled after the ADA, and was intended to harmonize Puerto Rico law with the federal statutory provisions of the ADA.   P.R. Laws Ann. tit. 1, § 504; see also Arce v. Aramark Corp., 239 F.Supp.2d 153 (D.P.R. 2003).   Thus, the elements of proof for a claim under Law 44 are essentially the same as for a claim under the ADA.   Zayas v. Commonwealth of Puerto Rico, 378 F.Supp.2d 13, 23-24 (D.P.R. 2005); see also, Roman-Martínez v. Delta Maint. Serv., Inc., 229 F.Supp.2d 79, 85 (D.P.R. 2002).

Because the Court has found that Plaintiff's ADA claims cannot lie, her claims under Law 44 suffer the same fate as the ADA claims. Accordingly, the Motion for Summary Judgment for Plaintiff's claims under Puerto Rico Law 44 is GRANTED.

### B. ADEA.

#### 1.  Age Discrimination/Retaliation.

The Court treats these claims together, insofar as the facts buttressing the allegations are the same, and finds that both claims fail for the same reasons Plaintiff's ADA retaliation claims fail, to wit, Plaintiff cannot establish that she suffered an adverse employment action.   Furthermore, on the facts as alleged, the Court cannot find that

Defendants' actions were motivated by age animus.

In order to prevail on an age discrimination claim, the plaintiff's age must have "actually played a role in [the employer's decision-making] process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 141, 120 S.Ct. 2097 (2000); Hoffman v. Applicators Sales & Serv., Inc., 439 F.3d 9, 17 (1st Cir. 2006).   When no direct evidence of discrimination exists, as in this case, the plaintiff may prove her case through the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817 668 (1973).

In order to establish a *prima facie* case of age-based termination under the ADEA, plaintiff must establish that (1) she was at least forty years old; (2) she was qualified for the position she had held; (3) she was dismissed or subject to an adverse employment action; and (4) the employer subsequently filled the position, demonstrating a continuing need for the plaintiff's services.   Vélez v. Thermo King de P.R., Inc., 585 F.3d 441, 447 (1st Cir. 2009).

Unlawful practices under the ADEA include discrimination by an employer on the basis of age, as well as retaliation by an employer against any individual who opposes age discrimination. See 29 U.S.C. § 623(a), (d). Where there is no direct evidence of retaliation, the plaintiff must show that (1) he/she engaged in ADEA-protected conduct, (2) he/she was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and adverse action.   Bennett v. Saint–Gobain Corp., 507 F.3d 23 (1st Cir.2007).

_____

The alleged discriminatory acts in question are summarized as follows:

1. Plaintiff requested a copy of Toperbee's Employee Handbook several times, both by email and in person, and Juarbe would tell her that she was being annoying.

2. Juarbe treated Plaintiff like a thief, treated her with contempt, refused meeting with her to sort things out, disregarded her requests, arbitrarily reprimanded her, wouldn't trust her and deprived her of her commissions.

3. Regarding an incident that occurred on July 23rd 2014, while Plaintiff was taking care of a patient and her co-worker was working on other matters, a man came into the store and stole seven (7) pairs of eyeware.   Plaintiff alleged contemptuous treatment by Juarbe because of this incident.   Both Plaintiff and her co-worker received memos.

4. Co-worker Michdali Mercado, who was hired by Juarbe, was always observing what she was doing.

5. When Plaintiff turned down the opportunity to do Toperbee's medical billing and coding, she asked Juarbe for a salary increase and he denied her request.

6. Juarbe gave a salary increase to another co-worker, Ms. Mayrim, who was studying to become an optician, yet Plaintiff concedes that the functions of an optician in training or a licensed optician are different from those of an optometrist assistant.

7. On August 4, 2014, Plaintiff received a memo from Juarbe regarding an apparent cash shortage that took place on July 25, 2014.

8. During certain months, Plaintiff was not paid commissions when she expected them because issues with health insurance providers resulted in a write off of accounts

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 53
_____

receivables.   None of the other employees received commissions.

9. When the sales were low, Plaintiff was sent home early although she had more seniority and, according to her understanding of Toperbee's policy, employees with less seniority were the first ones to be sent home on such occasions.

10. After Plaintiff filed the first administrative charge before the ADU, she was informed by Doris Santiago, Juarbe's assistant, that she was going to be relocated to another store in Caguas where Toperbee would be able to grant her request for a 9:00 am to 6:00 pm work schedule.

The Court analyzes the allegations in question keeping in mind that "Title VII does not limit adverse job action to strictly monetary considerations."   Collins v. Illinois, 830 F.2d 692, 703 (7th Cir. 1987).   Congress recognized that job discrimination can take many forms, and does not always manifest itself in easily documentable sanctions such as salary cuts or demotions.   Accordingly, Congress "cast the prohibitions of Title VII broadly" to encompass changes in working conditions that are somewhat more subtle, but equally adverse.   Rodríguez v. Bd. of Educ., 620 F.2d 362, 364 (2d Cir. 1980). Consistent with that broad statutory mandate, courts have routinely rejected any bright line rule that a transfer cannot qualify as an "adverse employment action" unless it results in a diminution in salary or a loss of benefits.   Marrero, 304 F.3d at 23-24.   It is the adverse employment action component that dooms both Plaintiff's ADEA and retaliation claims.

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 54
_____

Even a generous reading of the Complaint shows that Plaintiff suffered no adverse effect from any of the events detailed above.   The most that could qualify as adverse are the two (2) written warnings she received.   While offering no opinion on whether the warnings were properly given or not, the Court notes that her co-worker, Guzmán also received a written warning as a result of the theft of the eye ware, and neither of them received commissions that month.   No discriminatory treatment, therefore, ensued and nothing further came of the memos.

Regarding the alleged salary increases that were denied, it is uncontested that no one received a salary increase either, except Ms. Mayrim, and Defendants had a *bona fide*, non-discriminatory reason, that she was studying to become a licensed optician, and was thus was in a different salary table than Plaintiff (and all other optometrist assistants at PVSP).   Finally, regarding the issue of getting sent home early when the sales were low, Plaintiff also admits that because she was not able to cover the closing shifts due to her work schedule, the correct thing was to let her go home on days with low sales to control payroll overhead.

While it is conceivable that a disadvantageous transfer could be considered adverse (in this case, the transfer to Caguas), the Court cannot so find here for two reasons: 1) Toperbee had been contemplating the transfer for over a year before it was implemented, and in fact, had previously offered such a transfer to Plaintiff and she declined it; and 2) it would have been precisely the hours Plaintiff was asking for: 9:00 a.m. to 6:00 p.m. Thus, awarding Plaintiff specifically what she was asking for cannot possibly be seen as

adverse.   See Marrero, 304 F.3d at 23 (lateral a transfer that does not involve a demotion in form or substance is not a materially adverse employment action.)

Furthermore, for the sake of the argument and assuming that a *prima facie* case could be established, none of these acts or actions demonstrate that any age related animus by Defendants played a role in their decision-making process or had a determinative influence on the outcome.   In fact, there is a clear absence of said animus. Plaintiff has not pointed to any evidence to demonstrate that age discrimination was the actual reason or even a motivating factor in Toperbee's decisions.   Notably absent here are age-related comments that oftentimes permeate these types of cases.   See, *e.g.,* Rivera-Rivera v. Medina & Medina, Inc., No. 13-1889, 2017 WL 108046, at *3 (D.P.R. Jan. 11, 2017) (telling plaintiff that she was old and useless and worthless; that she was old and slow and should seek social security benefits; called her "vieja" and told her she should resign) and Villegas-Reyes v. Universidad Interamericana de P.R., 476 F.Supp.2d 84, 91 (D.P.R. 2007) (referring to the plaintiff as "anciana," "vieja," "abuela," and telling her that "she was too old and should retire").

On these facts, the Court cannot find any discrimination or retaliation on the basis of age.   Hence, Defendants' Motion for Summary Judgment on these grounds is GRANTED.

### 2.  Law 100.

Law 100, Puerto Rico's general employment discrimination statute, seeks to prevent discrimination in employment by reason of age, race, color, religion, sex, social

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 56
_____

or national origin or social condition.   P.R. Laws Ann. tit 29, § 146.   Law 100 is the Puerto Rico equivalent of the ADEA, but the two statutes differ on the burden of proof required to show discrimination.   See Cardona-Jiménez v. Bancomerico de Puerto Rico, 174 F.3d 36, 42 (1st Cir. 1999); and Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998).

In the present case, this is a distinction without a difference that the Court need not enter into, because referring to the merits of the claims asserted under Law 100 and ADEA, the First Circuit has stated that "[o]n the merits, age discrimination claims asserted under the ADEA and under Law 100 are coterminous."   Dávila v. Corporación De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 18 (1st Cir.2007); see also Rivera-Rivera, 2017 WL 108046, at *8 (dismissing claims under Law 100 as plaintiff was unable to make a *prima facie* showing under ADEA).

Thus, having found that Plaintiff has no valid claim under ADEA, the Court likewise determines that her claims under Law 100 cannot prosper.   Accordingly, the Motion for Summary Judgment as to the claims under Puerto Rico Law 100 is GRANTED.

### C. Constructive Discharge.

#### 1. Federal law.

Plaintiff contends that the conditions she endured at work were so egregious that she was forced to resign and, therefore, was constructively discharged by Defendants. "Constructive discharge" usually refers to "harassment so severe and oppressive that staying on the job while seeking redress -the rule save in exceptional cases- is

_____

'intolerable.'" Reed v. M.B.N.A. Mktg. Sys., Inc., 333 F.3d 27, 33 (1st Cir. 2003)); and see

Meléndez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F.3d 30, 36 (1st Cir. 2001)

(describing constructive discharge as "treatment so hostile or degrading that no

reasonable employee would tolerate continuing in the position").   "In other words, work

conditions must have been so intolerable that [Plaintiff's] decision to resign was 'void of

choice or free will'- that her only option was to quit."   EEOC v. Kohl's Dep't Stores, Inc.,

774 F.3d 127, 134 (1st Cir. 2014) (quoting Torrech–Hernández v. Gen. Elec. Co., 519 F.3d

41, 50 (1st Cir. 2008)).   This standard is an entirely objective one, [courts] do not put

weight on the employee's subjective beliefs, "'no matter how sincerely held.' "" Id.

(quoting Torrech-Hernández, 519 F.3d at 52); Calhoun v. Acme Cleveland Corp., 798 F.2d

559, 561 (1st Cir. 1986).

The purely objective test distinguishes the standard to prove constructive

discharge from that used to determine discrimination based on a hostile work

environment, because the First Circuit has held that "the fact that the plaintiff endured a

hostile work environment—without more—will not always support a finding of

constructive discharge."   Marrero, 304 F.3d at 28.

In the instant case, there are absolutely no facts from which the Court can

objectively conclude that the conditions at Plaintiff's workplace were so intolerable,

hostile or degrading that she had no choice but to resign.   On the contrary, Plaintiff was

offered a myriad of alternatives to better accommodate her condition, and she refused all

of them.   In addition, when Plaintiff was afforded the schedule she sought but at a

different store due to company needs, she quickly resigned without inquiring about any alternatives.   This has been found to mitigate against constructive discharge claims. See Zemrock v. Yankee Candle Co., No. 14-CV-30107-KAR, 2017 WL 506249, at *9 (D. Mass. Feb. 7, 2017) (finding that Plaintiff failed to meet the objective reasonable person standard because she did not avail herself of all available avenues of redress before she decided to leave her job); Cramer v. Bojangle' Rests., Inc., 498 Fed.Appx. 885, 887 (11th Cir. 2012) (finding insufficient evidence of constructive discharge where employee refused to give employer "an opportunity to correct the situation"); Williams v. Barnhill's Buffet, Inc., 290 Fed.Appx. 759, 762 (5th Cir. 2008) ("An employee who resigns without affording the employer a reasonable opportunity to address her concerns has not been constructively discharged").

Furthermore, Plaintiff was actively seeking employment elsewhere for nine (9) months previous to her resignation, and in fact, had been offered a position three (3) months before her transfer with Optiqus.   It is unlikely that Plaintiff would have remained working with Defendants after having secured a job offer if her working conditions had been truly as intolerable, hostile or degrading as alleged.

Because a reasonable person in Plaintiff's position "would not have concluded that departing from her job was her only available choice ... [Plaintiff] has failed to meet the 'reasonable person' element for a constructive discharge claim" as she failed to show her work conditions were "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign".   Kohl's Dep't Stores, Inc., 774 F.3d

at 135.   Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's constructive discharge claim is GRANTED.

### 2. Law 80.

Because Plaintiff's constructive discharge claim fails, her claim under Puerto Rio Law 80 must equally fail.   Law 80 requires employers to provide a mandatory severance pay to at-will employees who are discharged without just cause.   Ruiz–Sanchez v. Goodyear Tire & Rubber Co., 717 F.3d 249 (1st Cir. 2013).   The law, however, creates a presumption that all dismissals were effected without cause, and puts the burden on the employer to prove just cause for the dismissal by a preponderance of the evidence. See P.R. Laws Ann. tit. 29, § 185k; Rivera Figueroa v. The Fuller Brush Co., 180 D.P.R. 894, 906–907 (2011).

Yet, this presumption is not activated where a plaintiff proceeds under a constructive discharge theory.   In these cases, the presumption arises only after the employee provides sufficient evidence that the resignation was involuntary.   See Id., at 919.   As discussed above, Plaintiff failed to proffer sufficient evidence to prove that she was subject to a constructive discharge and, as such, she cannot show that her resignation was involuntary.   Plaintiff's claim for wrongful termination under Law 80 cannot lie.

Thus, Defendants' Motion for Summary Judgment as to the Law 80 claim is GRANTED.

### D. Individual liability.

Finally, Defendants assert that the claims brought against co-Defendant Juarbe

individually must be dismissed and the Court agrees.

The First Circuit has held that "there is no individual employee liability under Title VII." Fantini v. Salem State Coll., 557 F.3d 22, 31 (1st Cir. 2009). The First Circuit has not directly addressed whether the ADEA imposes individual employee liability, but "almost all circuits that have addressed the issue have determined that individual liability is not authorized." Orell v. UMass Mem'l Med. Ctr., Inc., 203 F. Supp. 2d 52, 64 (D. Mass. 2002) (collecting cases). Furthermore, given the "similarities between Title VII and the ADEA, it is virtually impossible to imagine that the Court of Appeals would read the ADEA to contemplate individual liability." Gascard v. Franklin Pierce Univ., No. 14-220-JL, 2015 WL 1097485, at *7 (D.N.H. Mar. 11, 2015).

Lastly, and to the extent Plaintiff also brings forth claims against co-Defendant Juarbe under the ADA, it fails for the same reason. See, e.g., Román-Oliveras v. P.R. Elec. Power Auth., 655 F.3d 43, 52 (1st Cir. 2011) (dismissing individual liability claim under ADA); Brandt v. Fitzpatrick, No. 1:15-CV-461-NT, 2016 WL 7115969, at *3 (D. Me. Dec. 5, 2016) (same).

As such, Defendants' Motion for Summary Judgment as to the individual claims brought against co-Defendant Juarbe is GRANTED.

## CONCLUSION

For all the aforementioned reasons, the Court hereby GRANTS Defendant's Motion for Summary Judgment (Docket No. 30) and DENIES Plaintiff's Request for partial Summary Judgment (Docket No. 41). In light thereof, this case is hereby

Jannette Castro Ramos, v. Toperbee Corporation, et al.
Civil No. 15-1462 (CVR)
Opinion and Order
Page 61
_____

DISMISSED WITH PREJUDICE.

Judgment will be entered accordingly.

IT IS SO ORDERED.

In San Juan, Puerto Rico, on this 13th day of March, 2017.

S/CAMILLE L. VELEZ-RIVE
CAMILLE L. VELEZ RIVE
UNITED STATES MAGISTRATE JUDGE